In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 21-1576, 21-1577 & 21-1971

DAUDI M. MWANGANGI,

*Plaintiff-Appellee/Cross-Appellant,*

*v.*

TAYLOR NIELSEN, *et al.,*

*Defendants-Appellants/Cross-Appellees,*

*and*

CITY OF LEBANON, INDIANA,

*Defendant/Cross-Appellee.*

———————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-04105 — **Jane Magnus-Stinson**, *Judge.*

———————————

ARGUED JANUARY 11, 2022 — DECIDED SEPTEMBER 15, 2022

———————————

Before EASTERBROOK, SCUDDER, and KIRSCH, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Daudi Mwangangi provided roadside assistance in the greater Indianapolis area. On October 7, 2017, he got a service request from a driver in need of a

jumpstart in nearby Lebanon, Indiana, and Mwangangi set out to help in his used Crown Victoria. On the way there he activated clear strobe lights on the outside of his car, and a driver that Mwangangi passed on the highway twice called 911 to report him as a police impersonator. Shortly after Mwangangi got the stranded Toyota Camry back up and running and on its way, he found himself at a Speedway gas pump surrounded by seven police officers from several surrounding jurisdictions.

The encounter escalated from there. Mwangangi was ordered from his car, handcuffed, patted down twice, and eventually arrested for police impersonation—charges that were not dropped until two years later, when everyone realized he had been telling the truth all along about his roadside assistance job. Sprawling litigation followed. The district court entered summary judgment for Mwangangi on many of his Fourth Amendment-based claims—and, in doing so, denied the police officers involved the protection of qualified immunity—but found for the City of Lebanon and individual officers as to others. Having taken our own close look at what transpired, we affirm some of the district court's rulings and reverse others.

## I

### A

Daudi Mwangangi worked for Finderserve, LLC, providing roadside assistance in and around Indianapolis. Around 9:30 p.m. on October 7, 2017, the company notified him that a driver in nearby Lebanon needed a jumpstart, so he set out for the job in his dark blue 2003 Ford Crown Victoria. Mwangangi arrived at a Speedway gas station about 45

minutes later and found the driver of a Toyota Camry parked at a gas pump and awaiting assistance. He parked his Crown Victoria nose-to-nose with and about two car lengths from the other driver, activated his clear flashing strobe lights for added visibility, and jumpstarted the Camry. Within minutes the Camry's driver was back on the road on his way to Cincinnati. Mwangangi turned off his strobe lights and pulled up to the gas pump to log the service call, fill his tank, and return home.

Unbeknownst to Mwangangi, however, the local police were looking for him. Dustin Washington, a driver that Mwangangi had passed on the highway en route to Lebanon, called 911 to report that a Crown Victoria with the license plate SR393 had "attempt[ed] to pull [him] over with strobe lights in their headlights." The 911 dispatcher relayed that information to law enforcement officers in the Lebanon area, advising them to "investigate for a possible police impersonator" driving a "Crown Vic with strobe lights." Washington called back a short time later when he happened to spot Mwangangi parked at the Lebanon Speedway. In his second 911 call, Washington reported that the same "unmarked Crown Vic that was impersonating a police officer" was now at the Speedway gas station "with his strobe lights flashing behind another car."

This second call touched off additional radio dispatches to local law enforcement. In the first two, the dispatcher informed officers that the "possible police impersonator" was at the Speedway with its strobe lights on and a "vehicle pulled over." In the third, the dispatcher advised that "the vehicle they thought they had pulled over left" the gas station, but

that the "blue Crown Vic" was still "pulled over by a pump" and the driver was in the vehicle.

All four City of Lebanon police officers on duty that night—Sergeant Ben Phelps, Officer Taylor Nielsen, Officer Trey Hendrix, and Officer Frank Noland—responded to the Speedway station. Three officers from nearby jurisdictions provided backup as well, including Officer Blayne Root from the neighboring Town of Whitestown.

Officer Nielsen arrived first, just a few minutes after Mwangangi jumpstarted the stranded Camry. When she pulled into the Speedway and parked behind Mwangangi's Crown Victoria, she immediately noticed a lightbar stretching across the vehicle's rear window and a sheriffs-supporter specialty license plate with a plate number matching the one that came over the radio dispatches. Officer Nielsen activated her red and blue lights and approached the front passenger-side window to ask Mwangangi a few questions. She saw reflective traffic vests, a mounted flashlight and tablet, and what appeared to be radar equipment inside the Crown Victoria, and so she asked Mwangangi to step outside his car to continue the questioning.

By this point, all the responding officers had arrived on the scene and, like Officer Nielsen, activated their lights. Officer Root met Mwangangi as he stepped out of the Crown Victoria and immediately turned him around and patted him down. The frisk turned up no weapons, but Officer Root proceeded to handcuff Mwangangi and move him away from the Crown Victoria. At that point Officer Root handed Mwangangi off to Officer Noland, who performed a second, more extensive pat down over Mwangangi's torso and arms, in between his spread legs, and inside his reflective safety vest. Mwangangi

remained handcuffed the entire time. The second pat down also did not turn up any weapons or contraband.

While this was unfolding, the Boone County dispatcher informed the officers at the scene that the 911 caller, Dustin Washington, was there too. Two officers then talked to Washington and the person with him and got a more complete account of what prompted the 911 calls. Washington stated that the Crown Victoria tailgated him on the highway, activated its strobe lights, and turned on its lefthand turn signal before passing him in the right lane. By chance, when Washington got off the highway a few minutes later, he spotted the same Crown Victoria parked nose-to-nose with another vehicle in the Speedway parking lot.

Armed with this new information, the officers huddled to discuss what they had learned so far and to decide next steps. Based on that conversation, Officer Nielsen returned to Mwangangi, read him his *Miranda* rights, and asked him a series of questions, including where he lived, what he did for a living, the nature of his visit to the Speedway, and the like. Mwangangi answered truthfully and told Officer Nielsen that he worked for a company named Finderserve and was at the gas station responding to a roadside assistance call from a motorist on his way to Cincinnati who needed a jumpstart. Officer Root, standing nearby and seeking to corroborate Mwangangi's story, ran a Google search for "Find*a*serve"— only and unsurprisingly (given the mistaken spelling) to find nothing. Mwangangi offered to pull up his call log for officers if they removed his handcuffs. He then declined their request to search his cell phone.

The officers conferred once more. In their view, Mwangangi's account did not add up: they found no trace of

Mwangangi's supposed employer on the internet, he had refused the officers' request to review his logbook, and they did not understand his recounting of the jumpstarted Camry's comings and goings. All of this led Sergeant Phelps, the ranking officer at the scene, to decide that they would "J3 and hook and search"—arrest Mwangangi and tow and perform an inventory search of the Crown Victoria—and let the prosecutors decide whether criminal charges should follow. So with that the officers took Mwangangi to the Boone County Jail, where he remained for two days.

Local prosecutors ultimately charged Mwangangi with impersonating a police officer, in violation of Indiana Code § 35-44.1-2-6(b). Law enforcement also secured a warrant to search his cell phone and iPad, which the police kept for five months. Mwangangi defended himself against the charge until it was finally dismissed two years later in October 2019.

Mwangangi brought a lawsuit of his own later that same month. He filed a complaint including causes of action that fell into three general buckets. *First*, he invoked 42 U.S.C. § 1983 and alleged that the individual police officers involved in his stop and arrest violated his Fourth Amendment rights. His theories of liability were wide-ranging, including challenging the initial investigatory stop, the two pat downs, the handcuffing, and the ultimate arrest decision. *Second*, Mwangangi sought to impose *Monell* liability against the City of Lebanon based on its handcuffing and vehicle inventory search policies. *Third*, he alleged state law theories of false arrest, false imprisonment, battery, negligence, and negligent training and supervision against the City and individual Lebanon police officers.

Following discovery, the parties filed cross-motions for summary judgment.

B

The district court's decision was a mixed bag for all involved. The court entered partial summary judgment for Mwangangi on four issues: (1) that Officer Root's pat down was an unreasonable search; (2) that the officers' decision to handcuff Mwangangi was unreasonable and converted his detention into an arrest without probable cause; (3) that Officer Noland's second pat down was also an unreasonable search; and (4) the officers' formal decision to arrest him lacked probable cause. On each point, the district court determined that the individual officers were not entitled to qualified immunity.

But the defendants were also partially successful on their cross-motion for summary judgment. The district court entered judgment in their favor on Mwangangi's challenges to the legality of his initial detention, Officer Nielsen's decision to order him out of his vehicle, and the alleged use of excessive force based on the tightness of his handcuffs. It also entered summary judgment for the City of Lebanon on Mwangangi's *Monell* claim based on the City's inventory search policy and for the relevant defendants on his state law claims of intentional infliction of emotional distress, negligent handling of property, and negligent training and supervision.

Finally, there were several issues that the district court concluded could not be resolved at summary judgment. These included Mwangangi's failure to intervene and supervisory liability allegations against individual officers, his *Monell* challenge relating to handcuffing, and his state law

theories of false imprisonment, false arrest, and battery. Those claims are set to proceed to trial after the resolution of this appeal.

The parties filed timely cross-appeals.

## II

We start with a note on appellate jurisdiction. The district court's "denial of qualified immunity is within our jurisdiction to review before a final judgment," because the "denial turns on 'abstract' questions of law" rather than factual disputes between the parties. *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020). Indeed, in ruling on those questions of law, the district court rightly viewed the facts in the light most favorable to Mwangangi, the nonmovant. We do the same. See *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995).

Mwangangi urges that we also have appellate jurisdiction over his cross-appeal because the district court entered a partial final judgment under Federal Rule of Civil Procedure 54(b). That rule permits a district court to "direct entry of a final judgment as to one or more, but fewer than all, claims" if the court "expressly determines that there is no just reason for delay." Fed R. Civ. P. 54(b); *Factory Mut. Ins. Co. v. Bobst Group USA, Inc.*, 392 F.3d 922, 924 (7th Cir. 2004) ("Rule 54(b) permits entry of a partial final judgment only when all of one party's claims or rights have been fully adjudicated, or when a distinct claim has been fully resolved with respect to all parties."). A district court's doing so brings the claims encompassed by the partial final judgment within the scope of 28 U.S.C. § 1291, which authorizes appellate jurisdiction over "final decisions of the district courts of the United States."

Our case law explains, however, that we do not always accept a Rule 54(b) partial final judgment at face value. See *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956) ("The District Court cannot, in the exercise of its discretion, treat as 'final' that which is not 'final' within the meaning of § 1291."). As a court of review, we must be assured that the district court has actually rendered a "final judgment"—"a 'judgment' in the sense that it is a decision upon a cognizable claim for relief," and "'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 7 (1980).

Our review of a purportedly final partial judgment proceeds in two steps. *Rankins v. Sys. Sols. of Kentucky, LLC*, 40 F.4th 589, 591–92 (7th Cir. 2022). First, we assess whether the "district court's order was truly a final judgment" by taking our own independent look at "the degree of overlap between the certified claim and all other parts of the case that are still pending in the district court." *Id.* at 592 (cleaned up). Essentially, we are looking to see whether "the certified claim is akin to a standalone lawsuit." *Id.* Second, "we must consider whether the district court abused its discretion in finding no just reason to delay the appeal of the adjudicated claim." *Id.* If these two requirements are not met, we must dismiss for lack of jurisdiction, because the Rule 54(b) judgment is not final for the purposes of § 1291. *Id.*

The district court's Rule 54(b) partial final judgment encompasses two claims: one arising from the inventory search of Mwangangi's vehicle and another regarding the retention of his property pursuant to a search warrant after his arrest. Those claims, in turn, encompass various federal and state

theories of liability—that the City is liable for the inventory search under *Monell,* for example, and that the City and individual officers shoulder responsibility for damage caused by the inventory search or for the unreasonable retention of Mwangangi's property under various state-law theories of lability.

We are confident the district court resolved these two claims as to *all* parties Mwangangi named and sought to hold responsible. We are equally confident both of those claims are distinct from the claims that remain pending in the district court and require resolution by trial—one based on Mwangangi's handcuffing and one based on his arrest. See, *e.g.*, 10 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2657 (4th ed.) ("[W]hen a claimant presents a number of legal theories, but will be permitted to recover only on one of them, the bases for recovery are mutually exclusive . . . and the plaintiff has only a single claim for relief for purposes of Rule 54(b).").

Put most simply, the inventory search and property retention claims resolved by the district court root themselves in discrete facts and seek redress for distinct and separately compensable harms when compared with the claims still pending and awaiting trial. See *Local P-171, Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Thompson*, 642 F.2d 1065, 1070–71 (7th Cir. 1981) ("At a minimum, claims cannot be separate unless separate recovery is possible on each."); Wright & Miller § 2657 ("[I]f the claims factually are separate and independent, then multiple claims clearly are present."). Nothing in this appeal affects the remaining claims. See *Horn v. Transcon Lines, Inc.*, 898 F.2d 589, 592 (7th Cir. 1990).

As to the second prong of our review, the district court concluded that there was no just reason for delay because the officer defendants were already "entitled to an appeal concerning the qualified immunity determinations." And, moreover, if Mwangangi were to prevail on either claim in his cross-appeal, whatever was sent back to the district court could be consolidated with his other claims for a single trial—avoiding piecemeal litigation in both the district court and our court.

We see no abuse of discretion in this determination. The officers were entitled to—and signaled their intent to take advantage of—immediate review of the district court's denial of qualified immunity on certain of Mwangangi's claims. The district court proceedings were already delayed then, and the court was within its discretion to conclude that the incremental burden from immediate appellate review of Mwangangi's finally-resolved claims was minimal.

We are therefore satisfied that we have appellate jurisdiction over all the claims before us. We can proceed to the merits.

### III

### A

The Fourth Amendment framework governing Mwangangi's various claims is well-established. All agree that "[s]topping someone is generally considered a seizure for which probable cause is required," with the Supreme Court in *Terry v. Ohio* recognizing "a limited exception to the Fourth Amendment's probable-cause requirement for brief investigatory stops." *United States v. Olson*, 41 F.4th 792, 799 (7th Cir. 2022) (citing 392 U.S. 1, 88 (1968)). These short detentions give

officers a chance to "verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015).

A *Terry* stop "requires only reasonable suspicion of criminal activity" to justify the seizure. *Olson*, 41 F.4th at 799. This standard, we have explained, requires the existence of "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cole*, 21 F.4th 421, 433 (7th Cir. 2021) (en banc) (quoting *Navarette v. California*, 572 U.S. 393, 396–97 (2014)). For the stop to "pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011) (quoting *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994)). During a *Terry* stop, officers may order a driver out of his vehicle, *Arizona v. Johnson*, 555 U.S. 323, 331 (2009), and then proceed to pat him down for weapons "if the officer reasonably concludes that the driver 'might be armed and presently dangerous,'" *id.*, based on "specific and articulable facts." *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007). But a *Terry* stop can "ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive," including through a disproportionate use of force. *Bullock*, 632 F.3d at 1015; *Olson*, 41 F.4th at 799.

Because courts confront nearly endless variations of facts in the *Terry* context, we have resisted the urge to conclude that an officer's use of a particular type of force automatically transforms a *Terry* stop into a full custodial arrest. See, *e.g.*, *Shoals*, 478 F.3d at 853 (collecting cases establishing that an

officer's decision to draw a weapon or handcuff the subject, standing alone, does not necessarily lead to the conclusion that the suspect was arrested). Even in an area of law with few hard and fast rules, however, the use of certain police restraint techniques such as "using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests," may become "so intrusive" as to "become[] tantamount to an arrest requiring probable cause." *Bullock*, 632 F.3d at 1016 (cleaned up); see also *Matz v. Klotka*, 769 F.3d 517, 526 (7th Cir. 2014) (explaining that these "hallmarks of formal arrest … should not be the norm during an investigatory detention").

Police may acquire enough information over the course of the stop to develop probable cause for an arrest. See *United States v. Reedy*, 989 F.3d 548, 553 (7th Cir. 2021). And "[p]robable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983." *Muhammad v. Pearson*, 900 F.3d 898, 907 (7th Cir. 2018); *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014) (explaining that an officer has probable cause "when the facts and circumstances within the officer's knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense" (cleaned up)).

But even if an officer's probable cause assessment is mistaken, qualified immunity may protect him from liability. *Huff*, 744 F.3d at 1007. If an officer has "arguable probable cause"—meaning that "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law"—we cannot say

that the officer violated the plaintiff's clearly established con-
stitutional rights. *Id.* (cleaned up); see also *McComas v. Brick-
ley*, 673 F.3d 722, 725 (7th Cir. 2012).

B

In the district court, Mwangangi challenged nearly every
aspect of his encounter with police, from the initial stop
through the officers' decisions to pat him down, handcuff
him, arrest him, and tow and search his vehicle, to even the
City's retention of his property for months after his arrest.

Our focus on appeal is narrower. The summary judgment
record supports the conclusion that Officer Nielsen had a
"particularized and objective basis" to justify an investigatory
*Terry* stop in the Speedway parking lot based on the infor-
mation relayed by the 911 dispatcher and what she saw when
she arrived on the scene. *Cole*, 21 F.4th at 433. It is equally
clear, in our view, that Officer Nielsen had ample authority to
ask Mwangangi to step out of his car to answer some ques-
tions. See *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). The
analysis gets a lot harder from that point forward, however.
We take it step by step to track the issues presented on appeal.

### 1. Officer Root's First Pat Down

Officer Blayne Root of the Whitestown police department
met Mwangangi as he stepped out of the Crown Victoria. Im-
mediately—based on nothing more than what was known
from the dispatch calls and his brief observation of the vehi-
cle, and over Mwangangi's denial that he had any weapons
on him—Officer Root instructed him to turn around and place
his phone on top of the car, patted him down for weapons,
and handcuffed him. Mwangangi contended, and the district
court agreed, that by doing so, Officer Root violated his

Fourth Amendment rights, and that Root's actions were so unreasonable as to deny him the defense of qualified immunity.

We see the initial pat down differently, based in large part on one key, undisputed fact. Some crimes, by their "very nature," we have explained, are "so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime." *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007) (citing *Terry*, 392 U.S. at 33 (Harlan, J., concurring)); see also *United States v. Snow*, 656 F.3d 498, 501 (7th Cir. 2011) (same). Here, the police were investigating suspected police impersonation—an offense that, in terms of the likelihood of a weapon being present, is far more akin to robbery, burglary, assault with weapons, or car theft (offenses where courts have found an automatic right to frisk) than crimes like marijuana possession, shoplifting, petty theft, trespassing, or alcohol offenses (where courts have required other circumstances suggesting the suspect is armed and dangerous). See 4 Wayne R. LaFave, Search & Seizure § 9.6(a) (6th ed. 2021); see also *Barnett*, 505 F.3d at 640 (concluding that burglary is one example of a "crime normally and reasonably expected to involve a weapon").

Taking stock of this context, we conclude that an officer in Officer Root's position could have reasonably suspected that Mwangangi had a weapon. Doubtless some instances of police impersonation may raise no reasonable suspicion of weapons being present. But here Officer Root, responding to a barebones dispatch and meeting a suspect climbing out of a darkly tinted vehicle resembling an unmarked police car, did not know enough to rule out the possibility that Mwangangi

was armed. We therefore cannot say that this first pat down violated Mwangangi's Fourth Amendment rights.

We need to sound a word of caution, though. Officer Root acknowledged in his deposition that, as a subjective matter, he had no reason to believe Mwangangi presented a danger. When pressed for a justification for the pat down, he suggested that "anything can be used as a weapon"—even commonplace items that people might keep in their cars like "windshield washer fluid" or a "ballpoint pen, [a] cell phone, [or] a highlighter." This goes way too far. As we have emphasized on prior occasions, these types of overgeneralized justifications—rationales applicable "to practically any person that had been around the area when the officers showed up"—cannot support an officer's proceeding from a stop to a frisk. *Doornbos v. City of Chicago*, 868 F.3d 572, 582 (7th Cir. 2017).

Because of the context of the potential crime under investigation and surrounding circumstances, Officer Root's decision to pat Mwangangi down did not amount to a constitutional violation. But do not mistake our overarching message: Officer Root's non-offense-based and nearly universally applicable justifications for his pat down of Mwangangi find no support in law. There is no "one free pat down" rule—full stop. Officers must be able to point to particular facts supporting an objectively reasonable suspicion that a suspect was armed and dangerous.

### 2. Officer Root's Decision to Handcuff

That brings us to Officer Root's handcuffing of Mwangangi immediately following the pat down. "[T]he use of handcuffs substantially aggravates the intrusiveness of a

*Terry* stop" and, as a meaningful "restraint[] on freedom of movement," is "*normally* associated with arrest." *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989) (emphasis in original); see also *United States v. Smith*, 3 F.3d 1088, 1094–95 (7th Cir. 1993). While there is no categorical rule that an officer's decision to place a suspect in handcuffs *always* transforms the interaction from a *Terry* stop into an arrest, it is the "rare case" in which "common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely only in this manner." *Glenna*, 878 F.2d at 973 (cleaned up); see also *United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013) ("Handcuffs in a *Terry* stop and frisk are not and should not be the norm.").

This was not that rare case. Compare, *e.g.*, *Glenna*, 878 F.2d at 973 (determining handcuffing did not indicate arrest where officers had dispatch information that the suspect possessed several small armed weapons and an explosive device and discovered a loaded clip during the stop); *United States v. Smith*, 697 F.3d 625, 631 (7th Cir. 2012) (concluding handcuffing a suspected bank robber, who was left on the scene with a single member of law enforcement, did not transform the stop into arrest); *Matz*, 769 F.3d at 526 (explaining that officers could handcuff, as part of a *Terry* stop, the associate of an AWOL gang member under investigation for an armed robbery and potential murder who had been spotted in a car with that gang member).

Nothing here is close to the circumstances present in *Glenna*, *Smith*, and *Matz*, and even in those cases the officers' use of handcuffs helped push the suspects' encounters to "the outer edge of a permissible *Terry* stop." *Matz*, 769 F.3d at 525. Officer Root did not hesitate to acknowledge that Mwangangi

was friendly, respectful, and fully compliant with his instructions after stepping out of the car. And the pat down dispelled any notion that, based on the nature of the 911 calls, he was dealing with an armed or dangerous suspect—the frisk did not turn up a weapon or contraband of any kind. Rather, Officer Root's use of handcuffs seems to have been automatic—a reflexive next step untethered to anything except highly generalized concerns about officer safety. As a result, Officer Root's use of handcuffs exceeded the permissible scope of the underlying *Terry* stop.

The question, then, is whether Officer Root's handcuffing effectuated a lawful de facto arrest of Mwangangi. The latter inquiry, in turn, depends on whether the facts and circumstances—as known to Officer Root at the time of the handcuffing—established probable cause to arrest Mwangangi for police impersonation under Indiana law. See, *e.g.*, *Robinson*, 30 F.3d at 785. We see the answer as no.

Officer Root knew very little at the moment he put Mwangangi in handcuffs. He knew (at least some of) what had been relayed through the 911 dispatcher to that point: that there was a "possible police impersonator" in a blue Crown Victoria with strobe lights and license plate SR393 heading toward Lebanon, and that the same unmarked car was later spotted at the Lebanon Speedway "with a vehicle pulled over." The few minutes of firsthand observations between when he arrived and when he placed Mwangangi in handcuffs did not add much. Indeed, in his deposition, Officer Root testified that he did not have "any specific memory" of anything that he observed until Officer Nielsen asked Mwangangi to step out of his car.

But without any details "relating to any specific activity associated with the Crown Victoria that represented illegality other than the conclusion" that the driver was a possible police impersonator, the information at Officer Root's disposal did not add up to a reasonable belief that Mwangangi had violated the Indiana statute prohibiting police impersonation— or committed any other crime. See *Maniscalco v. Simon*, 712 F.3d 1139, 1144 (7th Cir. 2013) (explaining an "arrest is permissible under the Fourth Amendment if the arresting officer had probable cause to make the arrest for any reason"). At bottom, when Officer Root handcuffed Mwangangi, all he knew was that Mwangangi got out of a vehicle that looked like an unmarked police car and, according to a dispatch call, belonged to a suspected police impersonator. There was nothing else to support a reasonable belief that Mwangangi had falsely represented that he was a police officer with the intent to deceive or induce compliance by another. See Ind. Code § 35-44.1-2-6.

Officer Root's arguments to the contrary fall short and into the common trap of borrowing information known to other officers on the scene to shore up his own probable cause assessment. But this is not the type of scenario where, under the so-called collective knowledge doctrine, Officer Root could rely on other officers' observations to justify the arrest, as he was not acting at their direction at the time. See, *e.g.*, *United States v. Nicksion*, 628 F.3d 368, 376–77 (7th Cir. 2010); see also *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992) (explaining, in the *Terry* context, that "the requesting officer's belief that there is sufficient evidence to detain a suspect must have been communicated to the officer performing the stop"). And even if Officer Root learned all of the relevant information as the encounter progressed, "the probable cause

analysis is an *ex ante* test: the fact that the officer later discovers additional evidence unknown to [him] at the time of the arrest is irrelevant as to whether probable cause existed at the crucial time." *Padula v. Leimbach*, 656 F.3d 595, 601 (7th Cir. 2011) (cleaned up).

Finally, on these facts, we cannot say that Officer Root had even "arguable probable cause" to arrest. "[A] reasonable officer in the same circumstances and possessing the same knowledge"—working essentially off only a 911 call, with no information about the underlying conduct that prompted that call—could not have reasonably believed that probable cause existed to arrest Mwangangi for police impersonation. *Huff*, 744 F.3d at 1007 (cleaned up). To conclude otherwise risks conflating the authority justifying the initial *Terry* stop with the authority to arrest. We decline to do so.

The district court was therefore right to enter summary judgment for Mwangangi on his Fourth Amendment handcuffing claim.

### 3. Officer Noland's Second Pat Down

We next turn to Mwangangi's claim against Officer Noland challenging the second pat down. Recall that Officer Root handed Mwangangi off to Officer Noland immediately after the initial pat down and handcuffing. Officer Noland then performed a second, more extensive pat down. The district court determined that this pat down was unreasonable because Officer Noland lacked any articulable basis for believing Mwangangi was armed and dangerous. And the district court saw the second pat down as "even more unreasonable" than Officer Root's first pat down, because Officer

Noland "personally witnessed Officer Root complete the first pat down and Mr. Mwangangi was in handcuffs."

Officer Noland nowhere challenges this precise ruling on appeal. Indeed, not a single word in the Lebanon officers' appellate brief—filed on behalf of Noland and others—addresses the second pat down, despite the district court's express, adverse ruling on Mwangangi's claim against Officer Noland and determination that he committed a Fourth Amendment violation. Instead, the Lebanon officers skip past the second pat down and argue only generally that everyone on the scene had at least arguable probable cause by the time Sergeant Phelps and Officer Nielsen made the formal decision to arrest.

The problem for Officer Noland, however, is that the formal arrest decision came well after the second pat down and, crucially, after officers had an opportunity to interview the 911 caller, his passenger, and Mwangangi himself. Cf. *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) (concluding that it was not "particularly important that the search preceded the arrest rather than vice versa" where—unlike here—"the formal arrest followed quickly on the heels of the challenged search of petitioner's person").

Officer Noland did not argue, as he might have, that he had an articulable suspicion that Mwangangi remained armed and dangerous even after Officer Root's first (perhaps more cursory) pat down, or that he independently had probable cause to arrest at that moment. And, of course, we cannot make those arguments for him; "[i]n our adversarial system of adjudication, we follow the principle of party presentation" that is "designed around the premise that parties represented by competent counsel know what is best for them, and are

responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (cleaned up).

Applying the principle here, we see no choice but to conclude that Officer Noland—by remaining entirely silent on the district court's direct, express analysis of his conduct—waived any challenge to the district court's determination that his second pat down violated Mwangangi's Fourth Amendment rights. See also, *e.g.*, *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 464 (7th Cir. 2021) (explaining that "[u]ndeveloped arguments are waived on appeal," and that, even where there is some elaboration in a reply brief, "arguments not made in the principal brief are forfeited").

### 4. The Officers' Formal Arrest Decision

Finally, Mwangangi urges that the officers' formal arrest decision lacked probable cause. We cannot agree. Circumstances changed between Officer Root's handcuffing of Mwangangi and the time that Sergeant Phelps and Officer Nielsen made the decision to formally arrest Mwangangi, tow his car, and transport him to the local jail. The arrest decision was reasonable based on what officers learned in the interim.

*First*, at roughly the same time that Officer Root handcuffed Mwangangi, Boone County Dispatch advised that the 911 caller was at the Speedway gas station in a black Kia. The dispatcher also relayed that the 911 caller positively identified Mwangangi's Crown Victoria as the vehicle he called about 30 minutes earlier.

*Second*, Sergeant Phelps and Officer Hendrix interviewed the 911 caller, Dustin Washington, and his passenger and learned more about what had prompted the first 911 call.

They told the officers that Mwangangi's Crown Victoria tailgated him on the highway with clear strobe lights on and its lefthand turn signal activated, which they interpreted as the Crown Victoria trying to get the Kia to move to the shoulder. When the Kia did not slow down or move out of the way, the Crown Victoria passed it in the right lane. Not long after, Washington spotted the same Crown Victoria parked nose-to-nose with a Toyota Camry in the Speedway parking lot—again with its strobe lights activated.

*Third*, in their brief discussion after the interview, the officers shared with each other what they had learned so far. For her part, Officer Nielsen told the others that Mwangangi had traffic vests, traffic cones, and "a whole radar system" in his car, and Officer Root added that he had a "light bar that goes the whole back window."

*Fourth*, Officer Nielsen interviewed Mwangangi. After telling him that he was "not under arrest" and reading him his *Miranda* rights, she asked questions about where Mwangangi lived, what he did for a living, whether he was driving his personal vehicle, whether the lights on his car were functioning, and whether he had activated them on the interstate earlier that night. She also asked some travel-related questions.

Over the course of this questioning, Mwangangi told Officer Nielsen that he lived in Carmel and worked for Finderserve doing roadside assistance—though the officers understood him to be saying "Find*a*serve." Mwangangi said that he had come to jumpstart a driver on their way from Chicago to Cincinnati. He also told officers that the car he jumpstarted was a black Toyota and that he had the car's information on his phone but declined when Officer Nielsen asked whether

they could go through his phone and look at the service requests for themselves.

In the officers' view, these facts, taken together, supplied a reasonable belief that Mwangangi had violated Indiana's police impersonation statute, § 35-44.1-2-6. See, *e.g.*, *Jump v. Village of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022) (explaining that probable cause "exists at arrest when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law"). And even if these facts did not add up to probable cause, the officers continue, they are entitled to qualified immunity because they did not have "fair notice, based upon then-existing precedent, that it would be unlawful to arrest [Mwangangi] for impersonating a law enforcement officer" on these facts—and a reasonable officer could have mistakenly believed that probable cause existed.

We agree with the officers that an objective assessment of the totality of the facts and circumstances they faced provided them with arguable probable cause to arrest Mwangangi. When Sergeant Phelps and Officer Nielsen made the formal arrest decision, they could rely on:

- A known eyewitness's statement describing how Mwangangi, driving an unmarked Crown Victoria, tailgated him and flashed strobe lights, seemingly in an attempt to get him to move to the side of the road;

- That same witness's account of Mwangangi pulled nose-to-nose with a different driver in the Speedway parking lot, again with the Crown Victoria's strobe lights activated; and

- Officer Nielsen's observations that Mwangangi had safety vests, traffic cones, a SureFire flashlight, a mounted tablet, and what appeared to be radar equipment inside of his vehicle, in addition to a lightbar stretching across the rear window, functioning strobe lights, and a sheriffs supporter license plate on the outside of his car.

The parties spill substantial ink about the proper interpretation of Indiana's police impersonation statute and what it means to "represent" oneself as a law enforcement officer. See Ind. Code § 35-44.1-2-6(b). There is very little guidance from Indiana courts on the question. But we need not wade into that thicket. Especially against the backdrop of an undeveloped statute, an officer could have reasonably, subjectively believed that Mwangangi violated the statute by attempting to pull another driver over in a car that resembled an unmarked police vehicle and that had common law enforcement tools inside—even if, as they did here, prosecutors later conclude that Mwangangi's conduct objectively did not fit the statutory prohibition. See, *e.g.*, *D.Z. v. Buell*, 796 F.3d 749, 755 (7th Cir. 2015) (explaining that "even if probable cause is lacking with respect to an arrest, an officer is entitled to qualified immunity if his subjective belief that he had probable cause was objectively reasonable").

To be sure, Mwangangi's truthful answers to the officers' questions certainly suggested that nothing suspect was afoot. And had the officers slowed down, clarified the name of Mwangangi's employer, and paid closer attention to what Mwangangi was saying, perhaps his encounter with police would not have ended with a trip to Boone County Jail. But

once "detectives have performed a good-faith investigation and assembled sufficient information from the totality of the circumstances to establish probable cause, they are not required under the Constitution to continue searching for additional evidence." *Jump*, 42 F.4th at 791. After officers reasonably believed that they had the information necessary to arrest—based on their own collective observations and a witness interview—they had no obligation to "seek out … allegedly exculpatory evidence." *Id.*

In sum, the officers had at least arguable probable cause to arrest Mwangangi for impersonating a police officer by the time Sergeant Phelps made the formal arrest decision. The district court erred, then, in entering summary judgment for Mwangangi as to liability on his false arrest claim against Sergeant Phelps, Officer Nielsen, and Officer Noland, and that determination is reversed.

## C

We have one final issue to address in resolving the individual officers' appeals. Beyond the Fourth Amendment claims we have addressed thus far, Mwangangi seeks to hold not only Officer Root liable for the false arrest, but also the other officers on the scene who failed to intervene to prevent the constitutional violation created by his continued handcuffing. The district court concluded that the individual officers had effectively waived any challenge to Mwangangi's failure to intervene claims. In the court's view, the defendants had not argued that the bystander officers were "not sufficiently involved in the alleged constitutional violation," and that the "undisputed evidence, viewed in the light most favorable to each of the Individual Defendants, establishes that" Officer Noland and Officer Nielsen were personally

involved in Mwangangi's "unconstitutional continued hand-cuffing."

The Lebanon defendants' briefing on appeal does not tackle this finding directly—nowhere does it address the issue of Officer Noland or Officer Nielsen's liability for failing to intervene to prevent Officer Root's conduct. See, *e.g.*, *Doxtator v. O'Brien*, 39 F.4th 852, 865 (7th Cir. 2022) ("An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know" that an unjustifiable arrest or other constitutional violation has been committed and "the officer had a realistic opportunity to intervene to prevent the harm from occurring." (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

But we are not as sure as the district court that Mwangangi is entitled to summary judgment on those claims. In fact, Mwangangi argued below that there were "still questions of material fact" on this question. Because whether the bystander officer "had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact," further factfinding on what Officer Nielsen and Officer Noland knew about Officer Root's actions over the course of the evening is needed on remand. *Doxtator*, 39 F.4th at 865. The district court, in short, was too quick to enter judgment against the officer defendants, rather than to send this claim to trial.

## IV

We come now to Mwangangi's cross appeal challenging two aspects of the district court's entry of summary judgment for the defendants: first, the resolution of his *Monell* inventory

search claims; and second, the district court's determination that the defendants are immune from his state law claims for negligent supervision and negligent handling of property under the Indiana Tort Claims Act.

## A

The district court concluded that Mwangangi waived his *Monell* claim based on the City of Lebanon's inventory search policy because "[f]rom [his] meager briefing, the [court] cannot discern exactly what practice, beyond a generalized 'inventory search,' is the subject of Mr. Mwangangi's complaint." Mwangangi concedes on appeal that "'skeletal' arguments may be properly treated as waived," but insists that he presented enough for the claim to be addressed on the merits.

Our review of the district court briefing turned up almost no mention of Mwangangi's inventory search-based *Monell* claim. In his summary judgment reply brief, Mwangangi argued for the first time only that Lebanon's "policies associated with Vehicle searches both as written and as practiced" led to violations of his civil rights "in the form of an unreasonable search." But that was not nearly enough to warrant the district court addressing the claim on the merits: "[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point." *United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990).

We therefore see no error in the district court's entry of summary judgment for the City on this claim.

B

The second aspect of Mwangangi's cross-appeal challenges the district court's entry of summary judgment on certain (often poorly defined) state law claims arising from "negligence resulting in damage" to his Crown Victoria "during or as a result of the police encounter and arrest" and the "unreasonable and negligent retention of plaintiff's personal property (phone and tablet) seized in relationship to the police encounter/arrest." He also adds a negligent training and supervision overlay to the vehicle search claim. Based on our review, however, the district court was right to conclude that the Indiana Tort Claims Act shields the individual officers and the City from liability on these claims. See *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003) (explaining that the ITCA "governs lawsuits against political subdivisions and their employees" and "provides substantial immunity for conduct within the scope of the employee's employment").

Under Section 34-13-3-3(8) of the Act, "[a] governmental entity … is not liable if a loss results from" the "adoption and enforcement of" a law, rule, or regulation, unless "the act of enforcement constitutes false arrest or false imprisonment." Mwangangi contends that the inventory search of his vehicle and retention of his property pursuant to a warrant were not "law enforcement" activities, but that does not hold up to even the slightest level of scrutiny. Indiana law vests law enforcement with responsibility for the retention of personal property seized during the execution of a search warrant. See Ind. Code § 35-33-5-5 (setting out procedures governing retention and return of "[a]ll items of property seized by any law enforcement agency as a result of an arrest, search warrant, or warrantless search").

These same principles apply to the inventory search of Mwangangi's Crown Victoria. These types of searches happen all day every day across the country—performed in large part to protect private property in police custody and to protect the police, themselves, from possible danger and from claims of lost or stolen property. See *Taylor v. State*, 842 N.E.2d 327, 330–31 (Ind. 2006). That the impoundment of a car and a subsequent inventory search are part of the police's "administrative or caretaking function rather than a criminal investigatory function" means only that "the policies underlying the Fourth Amendment warrant's requirement are inapplicable." *Fair v. State*, 627 N.E.2d 427, 430 (Ind. 1993). It does not, as Mwangangi presses, mean that police are acting outside of the scope of their law enforcement duties when doing an inventory of a vehicle.

As a result, the officers and the City are protected from state tort liability under the law enforcement exemption in § 34-13-3-3(8) as to Mwangangi's claims of negligence in performing the inventory of his car and retaining his property, even if (as Mwangangi alleges) officers deviated from departmental policy while doing so. See, *e.g.*, *City of Anderson v. Weatherford*, 714 N.E.2d 181, 185–86 (Ct. App. Ind. 1999) (concluding that officers' conduct while arresting the plaintiff pursuant to a valid arrest warrant did not "serve[] to remove them from the cover of the Tort Claims Act," even where the officers disregarded a supervisor's instructions and standard departmental procedures); *Serino v. Hensley*, 735 F.3d 588, 595 (7th Cir. 2013) (explaining that § 34-13-3-(8) covers even police "who engage in allegedly egregious conduct" while carrying out legitimate police activity).

Finally, the district court's Rule 54(b) partial final judgment references Mwangangi's state law failure to train claim against the City relating to the officers' performance of the inventory search. But we do not see any argument regarding this claim in Mwangangi's briefing, and so we consider it waived. See *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("[E]ven arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law.").

\*          \*          \*

For these reasons, the district court's Rule 54(b) partial final judgment, the basis of Mwangangi's cross-appeal, number 21-1971, is AFFIRMED. The district court's summary judgment opinion—the basis of appeals 21-1576 and 21-1577—is AFFIRMED in part and REVERSED and REMANDED in part as follows:

1. Entry of partial summary judgment for Mwangangi is AFFIRMED against Officer Blayne Root as to the false arrest and against Officer Frank Noland as to the second pat down.

2. Entry of partial summary judgment for Mwangangi is REVERSED as to the challenge to Officer Blayne Root's pat down and as to the alleged false arrest by Officer Taylor Nielsen, Officer Frank Noland, and Sergeant Ben Phelps.

3. Entry of partial summary judgment for Mwangangi against Officer Taylor Nielsen and Officer Frank Noland based on their

alleged failure to intervene is VACATED and
these theories of liability are REMANDED.

EASTERBROOK, *Circuit Judge*, concurring. I join the court's opinion and add an observation about one of plaintiff's legal theories.

Mwangangi contends that Noland and Nielsen are liable under 42 U.S.C. §1983 because they did not intervene to prevent Root from arresting him. He does not explain why. What statute or constitutional rule *requires* one employee of the government to stop another from making a mistake? The Supreme Court has held many times that §1983 supports only direct, and not vicarious, liability. See, e.g., *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). "Failure to intervene" sounds like vicarious liability. Mwangangi contends that Root violated the Fourth Amendment by arresting him without probable cause. If Noland and Nielsen participated in the arrest, they, too, may have violated the Fourth Amendment. But if, however, all they did was stand by while Root made an arrest, then what Mwangangi seeks is vicarious liability.

Many a plaintiff contends that the Constitution requires public employees to act for their protection. Yet *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), holds that our Constitution establishes negative liberties—the right to be free of official misconduct—rather than positive rights to have public employees protect private interests. See also, e.g., *Castle Rock v. Gonzales*, 545 U.S. 748 (2005). So a police officer who fails to stop a municipal bus that the officer sees being driven recklessly is not liable to a pedestrian later struck by the careening bus. Similarly, when persons who had been injured by soldiers' misconduct sued the Secretary of Defense, contending that the Secretary had to ensure his subordinates' correct behavior, we replied that this would

amount to forbidden vicarious liability. See *Vance v. Rumsfeld*, 701 F.3d 193, 203–05 (7th Cir. 2012) (en banc). The wrongdoers were personally liable, but others in the chain of command were not.

Perhaps state law requires police officers to prevent their fellows from violating suspects' rights, but §1983 cannot be used to enforce state law. Some federal statutes or constitutional provisions may require public employees to render assistance, and these *could* be enforced through §1983, because then liability would be direct rather than derivative. But Mwangangi has not cited any such sources of law.

Several decisions of this court say that police officers and prison guards must intervene when they see their colleagues acting improperly. See, e.g., *Doxtator v. O'Brien*, 39 F.4th 852, 865 (7th Cir. 2022). None of these decisions explains why this theory of liability is consistent with *Iqbal*, *Vance*, and similar decisions. *Doxtator* relies on *Abdullahi v. Madison*, 423 F.3d 763, 774 (7th Cir. 2005); *Lanigan v. East Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997); and *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994), all of which predate *Iqbal* and *Vance*. I suspect that these decisions arose in much the same way as today's quotation from *Doxtator* (slip op. 27): the plaintiff asserts that intervention is necessary, and the defendants do not provide a substantive response. The court observes (slip op. 27) that the Lebanon defendants' brief "does not tackle this issue directly"; certainly it does not invoke *Iqbal* or *Vance*. (It does cite *Iqbal*, but only for a point about appellate jurisdiction.) This is how circuit law comes to diverge from decisions of the Supreme Court and from our own *en banc* decisions.

Given the principle of party presentation, see *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020), I do not disagree with

my colleagues' decision to remand with respect to the failure-to-intervene theory against Noland and Nielsen. I hope, however, that litigants will not continue to allow this questionable theory to pass in silence.

KIRSCH, *Circuit Judge*, dissenting in part. I join the majority on every issue but one. The majority affirms the denial of qualified immunity to Officer Blayne Root, holding that he lacked even arguable probable cause to believe Daudi Mwangangi had violated Indiana's police impersonation law at the time he handcuffed Mwangangi. On this narrow issue, I disagree. Given the totality of what Officer Root knew at the time of the handcuffing and the lack of any clearly established law on what constitutes probable cause under Indiana's foggy police impersonation statute, I would hold that Root had arguable probable cause to believe Mwangangi had violated the statute.

Here's what Officer Root knew when he handcuffed Mwangangi: At about 9:50 pm on an October Saturday night, Officer Root received a message from Boone County Dispatch advising that a possible police impersonator was traveling westbound on I-865 and approaching I-65 North in a blue Crown Victoria (a common type of police cruiser) with strobe lights and the license plate number SR393. Another dispatch message notified Officer Root of a possible impersonator in an unmarked Crown Victoria at a Speedway gas station in Lebanon, Indiana "with a vehicle pulled over." When Officer Root arrived at the gas station, he pulled up to the left of Officer Taylor Nielsen and behind Mwangangi's vehicle, which matched the Crown Victoria description and had the same license plate as reported in the dispatch. As a result, he concluded that the officers "had the vehicle" in question. After Officer Nielsen asked Mwangangi to exit the vehicle, Officer Root asked him if he had any weapons and Mwangangi said no. Officer Root then proceeded to pat down Mwangangi for weapons. Although the pat down yielded no weapons, Officer Root handcuffed Mwangangi.

The majority emphasizes how little Officer Root knew and cites an admission in his deposition that he lacked any details "relating to any specific activity associated with the Crown Victoria that represented illegality other than the conclusion[.]" Supra at 19. But that statement requires context. Officer Root testified that he did not have "any specific memory of anything specific" he observed at Mwangangi's vehicle. Officer Root was not retracting his earlier testimony about the specifics that he learned from the dispatch calls or his belief that police had the matching Crown Victoria when he pulled up to the gas station.

In my view, an officer in Officer Root's position could have reasonably, if mistakenly, believed that there was probable cause that Mwangangi had committed the impersonation offense. See *Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 880 (7th Cir. 2012) (police officers are "entitled to qualified immunity in a false-arrest case when, if there is no probable cause, a reasonable officer could have mistakenly believed that probable cause existed." (citations omitted)). Indiana makes it a felony offense to falsely represent oneself as a police officer with the intent to deceive or to induce compliance with one's instructions, orders, or requests. Ind. Code 35-44.1-2-6. There are no Indiana cases that I could find addressing what probable cause looks like under Indiana's impersonation law (and we have not taken up the issue either), let alone anything that would clearly dictate to Officer Root that the information he possessed was insufficient under the statute. See *Holloway v. City of Milwaukee*, 43 F.4th 760, 767 (7th Cir. 2022) ("The unlawfulness of challenged conduct is 'clearly established' only if it is dictated by controlling authority or a robust consensus of cases of persuasive authority, such that it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted." (citation omitted and cleaned up)). Without any clearly established guidance from a court, or simply anything addressing a situation analogous to the one Officer Root confronted here, I do not agree that no reasonable officer in Root's situation could conclude that there was probable cause.

The majority warns that my conclusion "risks conflating the authority justifying the initial *Terry* stop with the authority to arrest." Supra at 20. While I agree that we must be careful not to muddy the waters on the level of suspicion required for constitutionally distinct seizures, there are cases where the information that supports reasonable suspicion also supplies arguable probable cause. This is one of them. Root knew that an unmarked Crown Victoria (not a tow truck) was driving on the interstate at night with strobe lights on, that the same vehicle may have pulled someone over at the gas station, and that the vehicle matched the description and license plate number dispatch provided.

I am not suggesting that Officer Root's actions were model officer conduct. He could have slowed down and taken further steps to confirm his suspicions before placing Mwangangi in handcuffs. But qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). And operating without any clearly established law, I conclude that an officer in Officer Root's position could have reasonably, if erroneously, believed that he had probable cause. For these reasons, I respectfully dissent.